UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

ST. PAUL TRAVELERS INSURANCE CO.,

                    Plaintiff,            08 Civ. 410 (JGK)

          - against -                     OPINION AND ORDER

M/V MADAME BUTTERFLY, ET AL.,

                    Defendants.
────────────────────────────────────

JOHN G. KOELTL, District Judge:

     St. Paul Travelers Insurance Co. ("St. Paul" or "the
plaintiff") is the subrogee insurer of a 2006 Sunseeker Predator
72 foot yacht ("the yacht") that was damaged when a crane
toppled over while the yacht was being offloaded from the M/V
Madame Butterfly at Port Hueneme, California.  St. Paul brings
this action against the ocean carrier, Wallenius Wilhelmsen
Logistics A/S, Wallenius Wilhelmsen Logistics, Inc., and
Wallenius Wilhelmsen Logistics Americas LLC (collectively,
"WWL"), crane lessor OST Trucks and Trains Inc. ("OST"), and the
stevedores responsible for offloading the yacht, Pacific Ro Ro
Stevedoring LLC ("PacRoRo") (collectively, "the defendants").
WWL, OST and PacRoRo allege that WWL was responsible for hiring
OST, and OST produced an invoice for the crane billing WWL.  St.
Paul, however, alleges that OST leased the crane to PacRoRo and
that OST was the negligent party.  St. Paul, seeking to recover
the payout of the $4,179,938 insurance claim, brings claims for

damage to goods in transit, negligence, unworkmanlike performance, conversion, negligent entrustment, and breach of contract.  OST brings various cross claims, including a claim for breach of contract against WWL on the grounds of express contractual indemnity and failure to provide insurance.

St. Paul argues that the defendants are liable under a service contract entered into by WWL for the shipment of various yachts with Peters & May, a freight forwarder, as agent for Sunseeker.  The defendants respond that the service contract does not apply and that the governing contract is actually the bill of lading, which would not permit suits against any party other than WWL and would limit WWL's liability to the $500 package limitation under the Carriage of Goods by Sea Act ("COGSA"), Pub. L. No. 97-31, § 12(146), 95 Stat. 166 (Aug. 6, 1981) (set out as note under 46 U.S.C. § 30701).  The Amended Verified Complaint does not refer at all to the service contract.  The only contract specifically referred to is the bill of lading which contains a choice of forum clause for the Southern District of New York.

WWL moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to limit its liability to the plaintiff to $500 and dismissing OST's breach of contract cross claims.  OST cross-moves for summary judgment pursuant to Rule 56 for dismissal of the Verified Amended Complaint against it.

OST opposes the dismissal of its breach of contract cross claims against WWL.  PacRoRo moves for summary judgment dismissing the Verified Amended Complaint against it or limiting PacRoRo's liability to $500 and dismissing OST's cross claims.  St. Paul likewise cross moves for summary judgment finding that the defendants are liable for the full amount of the damage to the yacht.

## I.

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial

burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Heicklen v. Toala, No. 08 Civ. 2457, 2010 WL 565426, at *1 (S.D.N.Y. Feb. 18, 2010).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving

4

party.  See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37

(2d Cir. 1994).  If the moving part meets its initial burden of

showing a lack of a material issue of fact, the burden shifts to

the nonmoving party to come forward with "specific facts showing

a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The

nonmoving party must produce evidence in the record and "may not

rely simply on conclusory statements or on contentions that the

affidavits supporting the motion are not credible."  Ying Jing

Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see

also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998);

Heicklen, 2010 WL 565426, at *1.


## II.


       The following facts are undisputed except otherwise noted.

       The yacht, built by Sunseeker International Ltd.

("Sunseeker") and insured by St. Paul for $4,179,938.00 was

dropped while being offloaded from the M/V Madame Butterfly in

Port Hueneme, California when a mobile crane tipped over.

(Pl.'s Rule 56.1 Statement of Material Facts in Supp. of Mot.

for Summ. J. ("Pl.'s 56.1 Stmt., Sept. 14, 2009") ¶¶ 1-2, Sept.

14, 2009; PacRoRo's Resp. to Pl.'s Rule 56.1 Statement of Facts

in Supp. of Mot. for Summ. J. ("PacRoRo's 56.1 Stmt., Oct. 13,

2009") ¶¶ 1-2, Oct. 13, 2009; WWL's Resps. to Pl.'s Rule 56.1

Statement of Material Facts ("WWL's 56.1 Stmt., Oct. 13, 2009")
¶¶ 1-2, Oct. 13, 2009.)  The parties do not dispute that the M/V
Madame Butterfly did not depart from its intended shipping route
and the yacht was not stowed on deck without authorization.
(WWL's Rule 56.1 Statement of Mat. Facts in Supp. of Mot. for
Partial Summ. J. ("WWL 56.1 Stmt., Aug. 24, 2009") ¶ 10, Aug.
24, 2009; Pl.'s Resp. to WWL's Rule 56.1 Statement of Mat. Facts
in Supp. of Mot. for Partial Summ. J. ("Pl.'s 56.1 Stmt., Sept.
14, 2009") ¶ 10, Sept. 14, 2009.)  OST was the lessor and
operator of the crane, and was the entity that configured the
crane.  (Pl.'s 56.1 Stmt. ¶ 4, Sept. 14, 2009; PacRoRo's 56.1
Stmt. ¶ 4, Oct. 13, 2009; WWL's 56.1 Stmt. ¶ 4, Oct. 13, 2009.)
WWL, the shipper, contracted with stevedore PacRoRo to offload
the yacht from the M/V Madame Butterfly.  (Pl.'s 56.1 Stmt. ¶ 5,
Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶ 5, Oct. 13, 2009; WWL's
56.1 Stmt. ¶ 5, Oct. 13, 2009.)

WWL entered into its annual service contract with Peters &
May, the freight forwarder, as agents for Sunseeker on April 1,
2006; but the parties dispute whether the service contract was
the contract that governed the shipment of the specific yacht in
this case.  (Pl.'s 56.1 Stmt. ¶¶ 3, 6-8, Sept. 14, 2009;
PacRoRo's 56.1 Stmt. ¶¶ 3, 6-8, Oct. 13, 2009; WWL's 56.1 Stmt.
¶¶ 3, 6-8, Oct. 13, 2009.)  The service contract provides that
"WWL may perform services [under the service contract] through

the use of subcontractors in accordance with the terms of [the service contract].   Whenever the term "WWL" or "Carrier" appears [in the service contract], it shall refer to WWL and its sub-contractors."   (Junge Decl. Ex. C at 1, Aug. 24, 2009.)   The service contract further provides that shipments under the service contract "shall be subject to the terms and conditions of the WWL Bill of Lading or Sea Waybill, whichever is applicable.   In the event of a conflict between the WWL Bill of Lading/Sea Waybill and the terms of this Contract, the terms of this Contract shall prevail."   (Junge Decl. Ex. C at 3, Aug. 24, 2009.)   The service contract also states:

> WWL shall be liable for all losses and/or damages to the goods while in its care, custody and control in accordance with the International Convention on the Unification of Rules on Bills of Lading in the version of the Amendment Protocol dated 23 February 1968 (Hague-Visby rules). . . . The maximum liability for WWL for loss of or damage to cargo should always be calculated in accordance with the International Convention on the Unification of Rules on Bills of Lading in the version of the Amendment Protocol dated 23 February 1968 (Hague-Visby rules).

(Junge Decl. Ex. C at 4, Aug. 24, 2009.)

The service contract provides that WWL will affix the service contract number to the relevant bill of lading for contract shipments, and it is undisputed that there is no service contract number affixed to the bill of lading for the shipment in this case.   (WWL's 56.1 Stmt. ¶¶ 15-16, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶¶ 15-16, Sept. 14, 2009; Junge Decl. Ex.

C at 6, Aug. 24, 2009.)  The service contract gives WWL the exclusive discretion to waive the requirement that the service contract number appear on the bill of lading.  (Junge. Decl. Ex. C at 6, Aug. 24, 2009.)  The service contract also contains an arbitration clause requiring that disputes under the service contract be arbitrated in London under English law, but St. Paul has not sought arbitration in London.  (WWL's 56.1 Stmt. ¶ 17, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶ 17, Sept. 14, 2009; Junge Decl. Ex. C at 7-8, Aug. 24, 2009.)  The service contract contains rates for various yacht models, but does not give a specific rate for the Predator 72 yacht shipped to California. It does provide a freight rate for a Predator 72 yacht shipped to the East Coast of the United States and it contains a freight provision for "all other models."  (WWL's 56.1 Stmt. ¶ 14, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶ 14, Sept. 14, 2009; Junge Decl. Ex. C at 12-15, Aug. 24, 2009.)  The freight rate for the yacht in question differed from the rate for "all other models" contained in the service contract and was separately negotiated by Gerald Price, the Marine Director for Peters & May.  (WWL's 56.1 Stmt. ¶ 14, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶ 14, Sept. 14, 2009.)

WWL's bill of lading No. GB536853 was the bill of lading for the shipment of the yacht.  (Junge Decl. Ex. B, Aug. 24, 2009.)  The bill of lading states that the yacht was "on board" on December 23, 2006, and was "freight prepaid including

discharge to water." (Junge Decl. Ex. B, Aug. 24, 2009.)  The
Amended Verified Complaint also alleged that WWL received the
yacht "[o]n or about December 23, 2006." (Am. Verified Compl. ¶
12.)  However, St. Paul now alleges that the yacht was not
loaded until December 26, 2006; WWL alleges that the correct
date was in fact December 23, 2006 and that the M/V Madame
Butterfly left Southampton at 9:08 p.m. on that day. (Pl.'s
56.1 Stmt. ¶ 16 & Ex. H, Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶
16, Oct. 13, 2009; WWL's 56.1 Stmt. ¶ 16, Oct. 13, 2009.)  St.
Paul claims that freight was not prepaid, but WWL alleges that
the freight was prepaid under a 30-day credit agreement. (Pl.'s
56.1 Stmt. ¶ 17, Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶ 17, Oct.
13, 2009; WWL's 56.1 Stmt. ¶ 17, Oct. 13, 2009.)  The bill of
lading also contains a forum selection clause providing that
suits should be filed in this Court and that the governing law
is COGSA and the "general law of the United States." (WWL's
56.1 Stmt. ¶ 18, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶ 18, Sept. 14,
2009; Junge Decl. Ex. B, Aug. 24, 2009.)

It is undisputed that if the bill of lading is the
applicable contract in this case, WWL's liability is limited.
The bill of lading states in clause 10:

> If U.S. COGSA applies to the contract evidenced by
> this bill of lading, the Carrier's liability is
> limited to U.S. $500 per package, or for goods not
> shipped in packages, per customary freight unit,
> unless a higher value is declared in the Declared

> Value box on the face of the bill of lading and a
> higher freight is paid.  Each unpackaged vehicle or
> other piece of unpackaged cargo on which freight is
> calculated, constitutes one customary freight unit.

(PacRoRo's Rule 56.1 Statement of Facts in Supp. of Mot. for

Summ. J. ("PacRoRo 56.1 Stmt., Sept. 14, 2009") ¶ 16, Sept. 14,

2009; Pl.'s Counter-Statement to PacRoRo's Rule 56.1 Statement

("Pl.'s 56.1 Stmt., Oct. 9, 2009") ¶ 16, Oct. 9, 2009; Junge

Decl. Ex. B, Aug. 24, 2009.)  The bill of lading states that the

Declared Value is "none" and the "No. of units or packages" is

listed as "1."  (Junge Decl. Ex. B, Aug. 24, 2009.)  Further

down, the bill of lading under "Total no. of containers or

packages received by the Carrier in words (See clause 10)" it

states "One Unit(s)."  (Junge Decl. Ex. B, Aug. 24, 2009.)

The bill of lading also contains a Himalaya Clause[1] at

Clause 15 permitting WWL to subcontract part of a contract of

carriage and extending WWL's defenses and limitations of

liability to subcontractors including, but not limited to ". . .

stevedores, terminal operators . . . direct and indirect

subcontractors, independent contractors, and every servant or

agent of the Carrier or of a subcontractor."  (WWL's 56.1 Stmt.

¶ 8, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶ 8, Sept. 14, 2009; Junge

Decl. Ex. B, Aug. 24, 2009.)

---

[1] A Himalaya Clause is "a contractual provision extend[ing] to third parties
the defenses, immunities, limitations or other protections a law or a bill of
lading confers on a carrier." Sompo Japan Ins. Co. of Am. V. Union Pac. R.R.
Co., 456 F.3d 54, 56-57 (2d Cir. 2006) (alteration in original, internal
quotation marks omitted).

The bill of lading also contains a provision called an "agreement to claim against no one other than the carrier" providing in part that:

> The Merchant undertakes that no claim or allegation shall be made, whether by the Merchant or any other person who is or who may subsequently be interested in the Goods, against any person (other than the Carrier) (whether it is a Subcontractor, principal, employer, servant, agent or otherwise) which imposes or attempts to impose upon such person any liability whatsoever and howsoever arising (including without limiting the foregoing from negligence or breach of contract or willful act or default of the Carrier or others) in connection with the Goods and if such claim or allegation should nevertheless be made to indemnify the Carrier and the person against whom such claim or allegation is made against the consequences of such claim or allegation . . . .

(PacRoRo 56.1 Stmt. ¶ 16, Sept. 14, 2009; Pl.'s 56.1 Stmt. ¶ 16, Oct. 9, 2009; Junge Decl. Ex. B, Aug. 24, 2009.)

WWL also submits a tariff effective December 24, 2006, which contains what WWL alleges are Dock Receipts Nos. GBSOU476619 and GBSOU476628 in the "Comments" section. (Pl.'s 56.1 Stmt. ¶¶ 18-20 & Ex. I, Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶¶ 18-20, Oct. 13, 2009; WWL's 56.1 Stmt. ¶¶ 18-20, Oct. 13, 2009.)  The defendants submitted evidence that there were in fact two yachts shipped on the M/V Madame Butterfly, and that the tariff is for both of these yachts.  (Piccione Decl. ¶ 2.) WWL submitted a declaration that that the M/V Madame Butterfly sailed at approximately 11:30 p.m. on December 23, a half hour

before the December 24 date estimated on the tariff.  (Piccione Decl. ¶ 6.)

OST has provided an invoice billing WWL for a "300 ton conventional crane with 170 ft of boom to offload Yachts from top of ship," but the section stating "Lease Agreement/Terms & Conditions On Back Agreed To:  Must be signed PRIOR to job commencement" is not signed by WWL.  (Junge Decl. Ex. G, Aug. 24, 2009.)  WWL alleges that it signed OST's invoices in only 4 of the 15 jobs it has performed for OST, and 2 of those were for cargo being worked the same day.  (WWL's 56.1 Stmt. ¶¶ 25-26, Aug. 24, 2009; Pl.'s 56.1 Stmt. ¶¶ 25-26, Sept. 14, 2009.)  The invoice contains an indemnity clause stating that the leesee (WWL) will indemnify OST for "any and all claims . . . which may arise from or in any manner relate (directly or indirectly) to the operations, use, maintenance, direction and/or control of the equipment and if applicable, all persons operating such equipment . . . ."  (Junge Decl. Ex. G, Aug. 24, 2009.)

St. Paul believes that OST leased the crane to PacRoRo, but WWL, PacRoRo, and OST all contend that OST leased the crane to WWL, and point to the unsigned invoice from OST to WWL.  (Pl.'s 56.1 Stmt. ¶¶ 52-53, 70-74, Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶¶ 52-53, 70-74, Oct. 13, 2009; WWL's 56.1 Stmt. ¶¶ 52-53, 70-74, Oct. 13, 2009; Junge Decl. Ex. G.)  There is no other document reflecting the lease of the crane by OST.

The insured value of the yacht was $4,179,932; but there is a dispute regarding whether the yacht's market value at destination was $4,175,936 or $2,415,815.  (Pl.'s 56.1 Stmt. ¶¶ 86-87 & Ex. A, Sept. 14, 2009; PacRoRo's 56.1 Stmt. ¶¶ 86-87, Oct. 13, 2009; WWL's 56.1 Stmt. ¶¶ 86-87, Oct. 13, 2009; OST 56.1 Stmt. ¶¶ 1-10, 12, Oct. 13, 2009.)

## III.

The central issue is whether the contract governing the carriage of the yacht is the service contract or the bill of lading.  The defendants argue that the carriage is governed by the bill of lading, while the plaintiff argues that the service contract governs.

## A.

The structure of the bill of lading is clear.  It requires the shipper to bring any claims against the carrier and precludes the shipper from suing any third parties.  It limits the shipper to the COGSA package limitation if COGSA applies unless the shipper chooses to declare a higher value and pay a higher rate.  This gives the shipper the option of purchasing other insurance as the shipper plainly did in this case, as

witnessed by the fact that St. Paul paid the loss and is suing instead of the shipper.

The bill of lading contains an explicit clause precluding the shipper from suing any party other than WWL for damages. The agreement not to sue clause provides that the shipper or any other person interested in the goods will make "no claim or allegation . . . against any person (other than the Carrier) (whether it is a Subcontractor, principal, employer, servant, agent or otherwise) . . . in connection with the Goods." (Junge Decl. Ex. B, Aug. 24, 2009.)  The agreement not to sue is broad, and dismissal of the plaintiff's claims against OST and PacRoRo is plainly required if the bill of lading is the governing contract.  See Allianz CP Gen. Ins. Co. v. Blue Anchor Line, No. 02 Civ. 2238, 2004 WL 1048228, at *6 (S.D.N.Y. May 7, 2004) (granting summary judgment in favor of participating carrier against insurance company when land carrier protected by similar agreement not to sue in bill of lading).

The defendants argue that COGSA applies to the bill of lading, and that the bill of lading contains an exclusive choice of forum provision selecting this Court as the forum.  COGSA applies "the owner or the charterer who enters into a contract of carriage with a shipper."  COGSA § 1(a).  Because the yacht in this case was shipped to a port in California, COGSA is the governing statute under the bill of lading.  The bill of lading

14

expressly provides that if COGSA applies, WWL's liability is
limited to $500 per package unless a higher freight is paid and
a higher value is declared in the Declared Value box of the bill
of lading, and no higher value was declared on the bill of
lading in this case.

The service contract, on the other hand, expressly provides
that the Hague-Visby rules apply.  The service contract also
provides for English law and contains an exclusive choice of
forum provision for arbitration in London.

In addition, the service contract provides that if there is
a conflict between the service contract and the bill of lading,
the service contract is the governing contract.

It is clear from the undisputed facts that the bill of
lading is the contract governing the carriage of the yacht.
Bills of lading are generally "contracts of carriage between the
shipper and carrier."  Great White Fleet (US) Ltd. v. DSCV
Transp., Inc., No. 00 Civ. 4073, 2000 WL 1480404, at *2
(S.D.N.Y. Oct. 5, 2000).  While it is true that "where the
parties' relationship is governed by a separate contract, that
contract acts as the contract of carriage and bills of lading
are mere receipts," id. (internal quotation marks omitted), no
separate contract governs the shipment of the yacht in this
case.  The service contract does govern a shipping relationship
between WWL and Peters & May, a freight forwarder, as agent for

Sunseeker, but it does not apply to the specific shipment of the yacht in this case.  The service contract requires that the service contract number appear on a bill of lading governed by the service contract, but the bill of lading in this case does not contain the service contract number.  WWL has the exclusive discretion to waive the requirement that the service contract number appear on the bill of lading, and WWL plainly has not waived the provision in this case.

Moreover, the service contract does not provide a freight rate for the specific shipment of the Predator 72 in this case, and indeed a separate tariff was negotiated and filed with the Federal Maritime Commission for this specific shipment.  It is true that the tariff went into effect on December 24, 2006, and there is a dispute regarding whether the vessel sailed on December 23 or December 26 of 2006.  However, this is not a material difference and does not render the bill of lading false.  Furthermore, if the vessel sailed on December 26, as the plaintiff alleges, then it is clear that the tariff applied to it and that therefore a separate freight rate not governed by the service contract applied to the carriage of the yacht.  Even if the vessel sailed on December 23 and the tariff was filed a day late, it is plain that a special rate was being filed for this cargo.

The plaintiff argues that Price, a representative of Peters & May who negotiated the freight rate, testified at his deposition that the service contract applied to the shipment of the yacht here because there was "already . . . an existing service contract in place." (Junge Decl. Ex. D at 4, Aug. 24, 2009.)  The testimony that the plaintiff relies upon is not a statement that the service contract applied to the shipment of the yacht, but only that there was a service contract in place. Indeed Peters testified that he negotiated a particular freight rate for this shipment, which would have been unnecessary if the service contract applied because that contact had a rate for other vessels not specifically listed.

After oral argument, the plaintiff submitted a declaration of Mr. Price dated December 14, 2009.  The declaration had been referred to in the plaintiff's reply papers, but had not been filed with the Court or served on the other parties, or referred to in the plaintiff's Rule 56.1 Statements.  While the defendants oppose consideration of the declaration, the Court has considered it because it was cited in the reply papers and was inadvertently omitted from the papers.  The declaration, however, does not create an issue of fact or undermine the plain terms of the bill of lading and the service contract.  In the declaration, Mr. Price, the shipper's agent, conclusorily stated that "[t]he bill of lading which was issued for this particular

shipment . . . was not a contract between the parties.  The bill of lading acted as a receipt.  The contract that governed the relationship between the parties was the Service Contract." (Price Decl. ¶ 9.)  This is a conclusory statement of a legal conclusion, without any reference to the actual terms of the documents.  The parties could have amended the service contract to cover this particular shipment, or included the service agreement number on the bill of lading.  They did neither.[2]

A party may not vary the plain terms of an agreement by merely asserting that the party believes the agreement to be other than what the agreement says on its face.  The interpretation of a maritime contract, including a bill of lading, is governed by United States federal maritime law.  See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22-23 (2004); Maersk, Inc. v. Neewra, Inc., No. 05 Civ. 4356, 2009 WL 5102754, at *19 (S.D.N.Y. Dec. 17, 2009).  The bill of lading itself provides that it is governed by COGSA and the "general law of the United States." (Junge Decl. Ex. B, Aug. 24, 2009.)

Under federal maritime law, a party cannot rely on extrinsic or parol evidence to modify the plain terms of an admiralty contract, including a bill of lading.  See Wallace Steel, Inc. v. Ingersoll-Rand Co., 739 F.2d 112, 115 (2d Cir.

---

[2] While the plaintiff attempts to assert that Price was a disinterested witness, he was the shipper's agent and was represented by the plaintiff's counsel at his deposition.  Nothing turns on his status, however, because his thoughts cannot alter the plain terms of the documents.

1984); Calchem Corp. v. Activsea USA LLC, No. 06 Civ. 1585, 2007
WL 2127188, at *3 n.11 (E.D.N.Y. July 25, 2007) (Under COGSA, "a
bill of lading may not be modified by extrinsic or parol
evidence.") (internal citation omitted); OT Africa Line Ltd.
v.First Class Shipping Corp., 124 F. Supp. 2d 817, 821 (S.D.N.Y.
2000) (under admiralty law, parol evidence rule provides that
"where the parties have reduced their agreement to writing,
evidence of prior or contemporaneous agreements may not be
offered to contradict, vary, or subtract from the terms of the
writing," otherwise "[i]n the absence of ambiguity, the effect
of admitting extrinsic evidence would be to allow one party to
substitute [a different view of that party's] obligations for
those clearly stated.") (internal quotation marks omitted).
Under the plain terms of the bill of lading and service contract
there is no ambiguity that the bill of lading is the governing
contract.  The service contract does not itself provide a
freight rate for the shipment of this yacht, and the rate was
negotiated separately.  The service contract's required
procedures, such as the use of the service contract number on
the bill of lading, were not followed.  The Court cannot alter
the plain meaning of the governing bill of lading by relying on
parol evidence regarding Price's views of the contract.

Finally, the service contract's exclusive forum selection
clause makes it clear that the plaintiff did not conceive that

this voyage was covered by the service contract.  The forum selection clause would require arbitration in London, but the plaintiff filed this suit in this Court in New York.  The Amended Verified Complaint did not even refer to the service contract and did rely on the forum selection clause in the bill of lading.  The plaintiff responds that New York was the only jurisdiction in which it could sue all of the defendants in one suit, but that is no reason to ignore a mandatory forum selection clause with regard to the defendant who was covered by that clause.  See Far E. Antique Arts v. M/V Cho Yang Success, No. 01 Civ. 8375, 2002 WL 1313308, at *3 (S.D.N.Y. June 14, 2002) (enforcing forum selection clause in admiralty case even when resulting in parallel litigation in different jurisdictions against multiple defendants).

Because the bill of lading governs the carriage of the yacht and because the bill of lading contains a broad clause prohibiting suits against persons other than the carrier, the plaintiff is precluded from suing OST and PacRoRo.  Therefore, the plaintiff's claims against OST and PacRoRo are dismissed.[3]

---

[3] St. Paul argues that OST is a sub-subcontractor of WWL rather than a subcontractor.  However, this argument applies to the Himalaya clause, which is relevant to the limitation of liability under COGSA.  The agreement not to sue provision in the bill of lading is very broad and covers any person other than WWL and is not limited to WWL's subcontractors.

**B.**

The plaintiff argues that the COGSA limitation on liability should not apply in this case because the bill of lading was a "false" bill of lading.

There are cases decided both before and after COGSA was enacted that have invalidated contractual or statutory limitations on liability where a carrier has unreasonably deviated from the usual commercial or contractual route or stowed cargo on deck without authorization, unless the carrier can show that the deviation did not cause the damage in question.  See Delphi-Delco Elecs. Sys. v. M/V Nedlloyd Europa, 324 F. Supp. 2d 403, 409-10 (S.D.N.Y. 2004) (collecting cases). There is no allegation that either of those deviations occurred in this case.

The Court of Appeals for the Second Circuit has extended the deviation exception to conclude that a carrier may lose the benefit of COGSA's package limitation by issuing a false bill of lading "that erroneously states that goods have been received on board when they have not been so loaded."  Id. at 410 (citing Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841 (2d Cir. 1985)).

Courts have limited the false bill of lading exception to the COGSA package limitation "to misrepresentations concerning

the physical condition or location of the goods at the time the bill of lading was issued." Delphi-Delco, 342 F. Supp. 2d at 411 (collecting cases). Courts have likewise required a nexus between the misrepresentation and the damage to the goods before finding that the COGSA package limitation does not apply. See Mobil Sales & Supply Corp. v. M.V. Banglar Kakoli, 588 F. Supp. 1134, 1141 (S.D.N.Y. 1984) ("[I]n the absence of a finding that the damage to its cargo was caused by such a deviation, [the plaintiff's] claims would be subject to COGSA's $500 per package limitation on liability.") Another way of stating the false bill of lading doctrine is that a carrier is estopped from denying the representations it makes in a bill of lading. See Berisford Metals, 779 F.2d at 846; Mitsui Marine Fire & Ins. Co. v. Direct Container Line, Inc., 119 F. Supp. 2d 412, 416 (S.D.N.Y.), aff'd, 21 F. App'x 58 (2d Cir. 2001) ("[A] false bill of lading results in a breach of the bill's warranty that goods are laden as indicated, or a false bill can be said to estop the carrier from denying what the bill represents as true.").

The plaintiff in this case suggests that there are errors in the bill of lading, such as the departure date of the vessel, which might void the application of COGSA's package limitation. However, any such errors are not material and are plainly not related to the loss of the yacht. The possibly erroneous

departure date and the disputed freight pre-paid clause are not causally related to the damage to the yacht in any way.  Even if the carrier is estopped from denying the sailing date and payment terms stated in the bill of lading, these aspects of the bill of lading nevertheless bear no relation to the damage to the yacht.  There is no allegation that the vessel deviated from its expected geographic route, or that the yacht was stored on deck without authorization, or that any errors in the bill of lading related to the damage to the yacht.  The only issues with respect to liability relate to what happened when the yacht was offloaded in California and had nothing to do with the plaintiff's allegations about the shipping date or the pre-payment clause.  The deviation doctrine "is not one to be extended," Delphi-Delco Elecs. Sys., 324 F. Supp. 2d at 412 (quoting Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser, 507 F.2d 68, 72 (2d Cir. 1974) (Friendly, J.)), and there is no reason to extend it to the circumstances of this case.[4]

_____

[4] The plaintiff acknowledged in a response to a request to admit that the bill of lading was not a false bill of lading.  See Fed. R. Civ. P. 36(b) (response to request for admission "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.").  The plaintiff argues unconvincingly that the admission was true because the plaintiff contends that the bill of lading was merely a receipt.  Regardless of the meaning of the plaintiff's admission, the arguments that the bill of lading was false do not hold water, for the reasons explained above.

**IV.**

The defendants argue that the $500 per package limitation on liability under COGSA applies to the shipment of the yacht. The plaintiff responds that the customary freight unit is per metric ton, and that liability is based on the weight of the yacht.

COGSA applies to every bill of lading or similar document of title "which is evidence of a contract for the carriage of goods by sea to or from ports of the United States . . . ." COGSA Introductory Note. See also Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing, 167 F.3d 99, 100 (2d Cir. 1999) (per curiam) (COGSA applies "to all contracts for carriage of goods by sea between the ports of the United States and the ports of foreign countries").  It applies to the bill of lading in this case which covers the shipment by sea from England to California. Under COGSA

> [n]either the carrier nor the ship shall in any event
> be or become liable for any loss or damage to or in
> connection with the transportation of goods in an
> amount exceeding $500 per package . . . or in the case
> of goods not shipped in packages, per customary
> freight unit, . . . unless the nature and value of
> such goods have been declared by the shipper before
> shipment and inserted in the bill of lading.

COGSA § 4(5); see also Nippon Fire & Marine, 167 F.3d at 101 (COGSA "provides that the carrier's liability is limited to $500

24

per package unless a higher value is declared by the shipper and inserted in the bill of lading, or the parties agree to a higher limit"); Gen. Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1024 (2d Cir. 1987) (same).

In this case, the agreement reflected in the bill of lading is not contrary to the provisions of COGSA; indeed, the bill of lading incorporated COGSA.  The bill of lading states

> If U.S. COGSA applies to the contract evidenced by
> this bill of lading, the Carrier's liability is
> limited to U.S. $500 per package, or for goods not
> shipped in packages, per customary freight unit,
> unless a higher value is declared in the Declared
> Value box on the fact of the bill of lading and a
> higher freight is paid.  Each unpackaged vehicle or
> other piece of unpackaged cargo on which freight is
> calculated, constitutes one customary freight unit.

(Junge Decl. Ex. B, Aug. 24, 2009.)

COGSA is inapplicable under the fair opportunity doctrine if the shipper is not provided with a fair opportunity to declare that the goods have a higher value and an opportunity to pay an additional charge for increased protection.  See Nippon Fire & Marine, 167 F.3d at 101; Gen Elec., 817 F.2d at 1028. The bill of lading in this case did provide the shipper with an opportunity to declare a higher value for the goods and pay for increased protection, but no such higher value was declared. [5]

_____

[5] One reason for the restrictions in the bill of lading is to give the shipper the opportunity to purchase a greater degree of coverage from the carrier, and to make it clear when a greater degree of coverage applies.  But in this case, the shipper chose not to purchase the increased coverage, understandably because the shipper had outside insurance coverage through St.

Because there is no agreement to the contrary, and because the shipper was provided an opportunity to declare a higher value for the yacht but failed to do so, COGSA's liability limitations apply.

When no higher value is declared, COGSA limits liability to $500 per package, or when an item is not shipped in packages, liability is limited to $500 per customary freight unit. See COGSA § 4(5). The plaintiff argues that a yacht shipped in a cradle is not a package, and that the customary freight unit is per metric ton. Under the plaintiff's theory of the case, the defendants are liable for up to $500 per metric ton. The plaintiff argues that the bill of lading states that the yacht weighed a total of 693.36 metric tons. Therefore, if the yacht is not one "package" for COGSA purposes, the defendants' liability is up to $500 X 693.36 metric tons, or $346,680. The defendants respond that a yacht in a cradle is one package under COGSA, and therefore their liability is limited to $500.

The bill of lading on its face supports the defendants' argument that their liability is limited to $500. The bill of lading defines a "package" as "the largest means used to prepare

---

Paul. Here, the shipper did not declare extra value and pay an extra charge for increased coverage, and now that the yacht has been damaged it seeks to hold the carrier liable. That the shipper cannot do. See Royal Ins. Co. v. Sea-Land Serv. Inc., 50 F.3d 723, 730 (9th Cir. 1995) ("an experienced shipper should not be permitted to gamble that no damage will occur, pay the customarily lower freight rates for goods of undeclared value, and then, when destruction in fact occurs, cry 'I did not know' and seek an exception to its own obligation under 46 [COGSA § 4(5)].").

cargo for transportation, including but not limited to, a skid, pallet, Container, trailer or carton." (Junge Decl. Ex. B, Aug. 24, 2009.)  Immediately after the incorporation of COGSA in the bill of lading, it states that "[e]ach unpackaged vehicle or other piece of unpackaged cargo on which freight is calculated, constitutes one customary freight unit." (Junge Decl. Ex. B, Aug. 24, 2009.)  The bill of lading lists the number of units of packages as 1, and keys the number of units to clause 10, the liability limitation clause of the bill of lading.  See Miller Yacht Sales, Inc. v. M.V. Vishva Shobha, 494 F. Supp. 1005, 1015 (S.D.N.Y. 1980) (yacht constitutes one package under COGSA, in part because bill of lading stated "No. of Packages:  1 Unit").  This language, on its face, limits the defendants' liability to $500 for the yacht in a cradle.  Either the yacht is considered one package, or it is unpackaged but nevertheless constitutes one customary freight unit.  Under either scenario, liability is no more than $500.

Moreover, courts have found that a yacht in a cradle is a single package for COGSA purposes and applied the $500 liability limitation when the yacht is damaged during unloading.  See SNC S.L.B. v. M/V Newark Bay, 111 F.3d 243, 244 (2d Cir. 1997) (liability limited to $500 in dropped yacht case); Royal Ins. Co. v. Sea-Land Serv. Inc., 50 F.3d 723, 727 (9th Cir. 1995) (citing Inst. of London Underwriters v. Sea-Land Serv., Inc.,

881 F.2d 761 (9th Cir. 1989)) (yacht found to be one COGSA package).  Courts have disagreed whether there is one package when items are shipped "partially packaged," including yachts, see Aluminios Pozuelo Ltd. v. S.S. Navigator, 407 F.2d 152, 155 (2d Cir. 1968), or where there are factual issues regarding whether the contractual definition of a package in a bill of lading applies to a yacht.  See Sail Am. Found. V. M/V T.S. Prosperity, 778 F. Supp. 1282, 1287-88 (S.D.N.Y. 1991) (finding question of fact regarding whether yacht qualified as container or package under governing contractual language).  In this case, however, the bill of lading is clear that the yacht constituted either one package or one customary freight unit.  The COGSA limitation is therefore $500.

## V.


Because there is an agreement not to sue any party other than WWL in the bill of lading, the plaintiff's claims against PacRoRo and OST must be dismissed.  However, even in the absence of an agreement not to sue, PacRoRo and OST would still be protected by the same limitations on liability that apply to WWL.

The bill of lading contains a Himalaya clause extending all defenses and limitations of liability to subcontractors

including, but not limited to ". . . stevedores, terminal operators . . . direct and indirect subcontractors, independent contractors, and every servant or agent of the Carrier or of a subcontractor." (Junge Decl. Ex. B, Aug. 24, 2009.) There is no dispute that PacRoRo is a subcontractor stevedore explicitly covered by the Himalaya clause. The plaintiff alleges that OST leased the crane to PacRoRo rather than to WWL, and is therefore a sub-subcontractor of WWL who is not covered by the Himalaya clause. The defendants, however, argue that OST leased the crane to WWL, and indeed OST produced an invoice billing WWL for the crane.

Even if OST were merely a sub-subcontractor of WWL, the Himalaya clause is sufficiently broad to cover OST because in that situation OST would at least be a "servant or agent . . . of a subcontractor." (Junge Decl. Ex. B, Aug. 24, 2009.) The Himalaya clause need not specifically name a crane lessor for that entity to be covered under the clause. Cf. Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 332 (2d Cir. 1993). The bill of lading in this case not only prevents the shipper from suing any party other than WWL, it also extends liability protection to "servant[s] or agent[s] . . . of a subcontractor," (Junge Decl.

Ex. B, Aug. 24, 2009) and therefore expresses the intent to extend COGSA benefits to such third parties.[6]

**VI.**

OST brings various cross claims against WWL and PacRoRo, including a claim for indemnity.  Because OST is not liable under the bill of lading, the claim for indemnity is moot.  At the argument of the current motions, OST agreed that it was not pursuing any such claims if it were not liable because of the limitation on liability in the bill of lading.  OST's cross claims are therefore dismissed.

---

[6] The contractual clause is determinative of the extent of the Himalaya clause. See Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 333 (2d Cir. 1993).  The Himalaya clause in Mikinberg, unlike in this case, was expressly limited to "[every] servant or agent of the Carrier (including every independent contractor) . . . employed by the Carrier."  Id. at 332 (alteration in original).  The Himalaya clause in this case expressly includes "servant[s] or agent[s] . . . of a subcontractor," (Junge Decl. Ex. B, Aug. 24, 2009), not merely the servants or agents of the carrier.  In any event, WWL, OST, and PacRoRo all allege that OST was a subcontractor of WWL, and have produced an invoice supporting their claim.  There is no evidence to the contrary.

**CONCLUSION**

The claims against OST and PacRoRo are **dismissed**.   WWL's

motion for summary judgment limiting its liability to $500 is

**granted**.   St. Paul's motion for summary judgment is **denied**.

OST's cross claims for indemnity are **dismissed**.

The Clerk is directed to close Docket Nos. 71, 79, 83 and

86.

**SO ORDERED.**

Dated:     **New York, New York**
           **March 30, 2010**

                                    John G. Koeltl
                              United States District Judge

31